**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No.   2:18-CV-6501 |
| v. | |
| MARK BURNETT, JEFFREY MILLER, CHRISTIAN ROMANDETTI, FRANK SARRO, ANTHONY VASSALLO, ELITE STOCK RESEARCH, INC., | COMPLAINT JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Mark Burnett, Jeffrey Miller, Christian Romandetti, Frank Sarro, Anthony Vassallo, and Elite Stock Research, Inc. ("Elite Stock Research"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      Defendants orchestrated and implemented a fraudulent scheme, beginning in at least September 2013 and lasting until approximately June 2016, to manipulate the market price and trading volume of First Choice Healthcare Solutions ("FCHS") securities that earned them over $3.3 million in trading profits while causing at least $2.5 million in losses to more than 100 unsuspecting retail investors.

2.      The fraud began when Burnett, Miller, Sarro, and Vassallo, with the help of FCHS's Chief Executive Officer ("CEO") Romandetti, acquired large blocks of FCHS shares. Burnett, Miller, Romandetti and Sarro (collectively, the "Orchestrator Defendants") then

1

engaged Elite Stock Research, a "boiler room"[1] operated and controlled by Vassallo, to promote artificially, or fraudulently "pump," the market price and trading volume of FCHS shares.  The Orchestrator Defendants paid Vassallo and Elite Stock Research in cash and large blocks of FCHS securities for their services.

3.       Elite Stock Research, Vassallo, Burnett, Miller, and Sarro engaged in manipulative trading of their FCHS shares, including "marking the close" and executing "matched" and "wash" trades designed to artificially raise the market price and trading volume of FCHS and give the false appearance of active trading and a rising price for the security.

4.       Simultaneously, Elite Stock Research and Vassallo implemented a large-scale promotional campaign touting FCHS, targeting retail investors − specifically the elderly and unsophisticated − and aggressively soliciting them to purchase FCHS stock while failing to disclose that Elite Stock Research was at the same time engaging in manipulative trades designed to artificially increase the trading volume and market price of FCHS shares.

5.       As a result of this fraudulent scheme, the Defendants artificially "pumped" the price of FCHS above its true market value and realized millions of dollars in illegal proceeds when they sold, or "dumped," the security at artificially high prices to retail investors. Meanwhile, these unsuspecting investors lost millions.

## VIOLATIONS AND RELIEF SOUGHT

6.       By virtue of the conduct alleged herein, Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5

---

[1]       "'Boiler room' activity consists essentially of offering to customers securities of certain issuers in large volume by means of an intensive selling campaign through numerous salesmen by telephone or direct mail, without regard to the suitability to the needs of the customer, in such a manner as to induce a hasty decision to buy the security being offered without disclosure of the material facts about the issuer." *SEC v. R.J. Allen & Assocs., Inc.*, 386 F. Supp. 866, 874 (S.D. Fla. 1974).

thereunder [17 C.F.R. § 240.10b-5], Section 9(a)(1) of the Exchange Act [15 U.S.C. §78i(a)(1)], Section 9(a)(2) of the Exchange Act [15 U.S.C. §78i(a)(2)], Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and/or Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

7.     The Court should permanently enjoin Defendants from violating the securities laws; order all Defendants to disgorge their ill-gotten gains, together with prejudgment interest; order all Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; impose a penny stock bar pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; enter an officer-and-director bar against Christian Romandetti and Mark Burnett, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and order any other relief the Court may deem just and appropriate.

## JURISDICTION AND VENUE

8.     The Court possesses jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

9.     Venue lies in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because certain of the transactions, acts, practices and courses of conduct constituting the violations alleged in this Complaint occurred within the Eastern District of New York.  Among other things, Elite Stock Research's principal place of business while the scheme alleged in this Complaint took place was in the Eastern District of New York, and certain Defendants reside in this District.

10.     In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert with others, have contacted investors in dozens of states, including California, Georgia, Maine, Massachusetts, Mississippi, Missouri, New Jersey, Oklahoma, Oregon, Wyoming, made the use of the means or instrumentalities of interstate commerce, and made use of the means or instruments of transportation or communication in interstate commerce, and of the mails and of the facilities of a national securities exchange to carry out the unlawful conduct alleged in this Complaint.

## DEFENDANTS

### I.     The Orchestrator Defendants

11.     **Mark Burnett**, age 58, is a resident of Roslyn, New York.  Burnett was registered with the National Futures Association from 1982 to 1990, including as a floor broker, an associated person, and a principal.  Burnett has served as a director of at least one publicly traded company.

12.     **Jeffrey Miller**, age 63, is a resident of Bellmore, New York.  From 1993 to 2006, Miller was associated with a number of broker-dealers as a registered representative and has held Series 7 and 63 licenses.  On May 7, 2001, Miller was suspended from association with any NASD member for five business days and fined $7,500.

13.     **Christian Romandetti**, age 57, is a resident of Indialantic, Florida.  Romandetti has served as FCHS' Chairman, President, and CEO since 2010.

14.     **Frank Sarro**, age 63, is a resident of Palm Bay, Florida.  Sarro controlled at least six entities and eight brokerage accounts that engaged in profitable and manipulative trading in FCHS.

## II.      The Boiler Room Defendants

15.     **Elite Stock Research, Inc.** is a New York entity incorporated on August 12, 2013, that was headquartered in Plainview, New York, during times relevant to this Complaint. Between at least August 2013 and until approximately mid-2016, Elite Stock Research promoted a number of microcap securities including, but not limited to, FCHS. Elite Stock Research has never been registered with the Commission in any capacity.

16.     **Anthony Vassallo**, age 55, is a resident of Franklin Lakes, New Jersey. Vassallo was Elite Stock Research's CEO and has controlled its operations since at least August 2013. From approximately 1988 to 1994, Vassallo worked for a number of broker-dealers as a registered representative. During that time, Vassallo held Series 7 and 63 licenses. On July 11, 2017, the United States Attorney's Office for the Eastern District of New York indicted Vassallo and others for securities fraud in *U.S. v. Chartier, et al.,* No. 1:17-CR-00372-JS (E.D.N.Y.), and, the following day, the Commission charged him, Elite Stock Research, and others with related violations of the Federal securities laws in *SEC v. PowerTradersPress.com, Inc., et al.*, No. 17-CV-04133 (E.D.N.Y.). Both cases remain pending. In addition, on May 26, 1995, the United States District Court for the Southern District of New York permanently enjoined Vassallo from violations of the registration, antifraud, and penny stock provisions of the Federal securities laws in *SEC v. Olsen Laboratories, Inc.*, No. 94-CV-06280 (S.D.N.Y. May 26, 1995). In a related administrative proceeding, on June 13, 1995, Vassallo consented to an order barring him from association with a broker, dealer, investment adviser, municipal securities dealer or investment company and from participating in a penny stock offering. Finally, on July 12, 2013, Vassallo was sanctioned by the State of Connecticut Department of Banking for violations of the antifraud

and registration requirements of the State of Connecticut.    At all times relevant to this

Complaint, Vassallo was not registered with the Commission in any capacity.

### III.        Issuer

17.    **First Choice Healthcare Solutions, Inc.** is a Florida corporation headquartered

in Melbourne, Florida.  FCHS's common stock (ticker symbol "FCHS") is registered under 12(g)

of the Exchange Act, and is currently quoted on the OTC Link.  During the relevant period,

FCHS's securities qualified as a "penny stock" because they did not meet any of the exceptions

from the definition of a "penny stock," pursuant to Section 3(a)(51) of the Exchange Act [15

U.S.C. § 78c(a)(51) and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].  Among other things,

the securities were equity securities: (1) that were not an "NMS stock," as defined in 17 C.F.R.

§ 242.600(b)(47); (2) traded below five dollars per share during the relevant period; (3) whose

issuer had net tangible assets and average revenue below the thresholds of Rule 3a51-1(g)(1);

and (4) did not meet any of the other exceptions from the definition of "penny stock" contained

in Rule 3a51-1 under the Exchange Act.

### IV.        Other Relevant Entities And Individuals

18.    **4J Consulting Corp.** ("4J Consulting") is a New York entity incorporated on

May 9, 2006, by Miller.  Miller is the sole signatory on 4J Consulting's bank and trading

accounts.

19.    **East Coast LLC** ("East Coast") is a Delaware entity incorporated on December

3, 2010, by Sarro.  Sarro is the sole signatory on East Coast's bank and trading accounts.

20.    **Fuse Capital LLC** ("Fuse Capital") is a New York entity incorporated on June

23, 2011, by Burnett.  Burnett is the sole signatory on Fuse Capital's bank and trading accounts.

21.     **Leading Edge of Colorado, LLC** ("Leading Edge of Colorado") is a Delaware entity incorporated on December 3, 2010.  Miller is the sole member of Leading Edge of Colorado.

22.     **MedTech Diagnostics LLC** ("MedTech") is a Delaware entity incorporated on May 17, 2013.  Romandetti assisted in the creation of MedTech.

23.     **Mountain Peak Investments, LLC** ("Mountain Peak Investments") is a Delaware entity incorporated on December 3, 2010.  Sarro is the President of Mountain Peak Investments.

24.     **Employee 1** worked at Elite Stock Research from approximately January 2014 to November 2015.

25.     **Employee 2** worked at Elite Stock Research from approximately February to June 2014.

## GLOSSARY OF TERMS USED IN THIS COMPLAINT

26.      "Marking the close" is a form of market manipulation that involves attempting to influence the closing price of a security by executing purchase or sale orders at or near the close of normal trading hours.  Such activity can artificially inflate or depress the closing price for the security.

27.     A "matched trade" is an order to buy or sell securities that is entered with knowledge that a matching order on the opposite side of the transaction has been or will be entered for the purpose of (1) creating a false or misleading appearance of active trading in any publicly traded security; or (2) creating a false or misleading appearance with respect to the market for any such security.

28.     "Scalping" is a fraudulent practice of promoting third parties to purchase a security without disclosing that the promoter had some financial interest in that security, such as receiving compensation from the issuer for promoting the security, or owning that security and then selling it contemporaneously with the promotional activity to profit from the market activity that follows the promotion.

29.     A "wash trade" is an order to buy or sell securities resulting in no change of beneficial ownership for the purpose of (1) creating a false or misleading appearance of active trading in any publicly traded security; or (2) creating a false or misleading appearance with respect to the market for any such security.

## FACTUAL ALLEGATIONS

### I.     Elite Stock Research's Boiler Room Operations

30.     Elite Stock Research was incorporated in August 2013, and operated out of its headquarters in Plainview, New York, at all times relevant to the allegations in this Complaint.

31.     According to its website, Elite Stock Research provided investors with "top quality trade recommendations and . . . research that you can trust."  However, Elite Stock Research operated as a boiler room, employing numerous individuals and using approximately 19 different telephone lines to artificially increase the price of certain microcap securities, including FCHS, via manipulative trading and strong-arm, promotional campaigns ("pump" or "pumping").

32.     Between 2014 and 2015, Elite Stock Research paid Employee 1 and Employee 2 − who were engaged in the FCHS promotional campaign − more than $313,000 in salary and commissions.

33.     Vassallo served as the CEO of Elite Stock Research and controlled its operations during the relevant time period.  Vassallo had trading authority over the Elite Stock Research brokerage accounts and was a signatory on Elite Stock Research's bank account.  Vassallo also received proceeds from the sale of securities promoted by the firm.  Between October 2013 and June 2016, Vassallo received more than $260,000 in checks and direct withdrawals from Elite Stock Research's bank account.

## II.     The FCHS Manipulative Trading Scheme

### A.     Burnett, Miller, Sarro, and Vassallo Acquired FCHS Shares

34.     FCHS, formerly known as Medical Billing Assistance, was formed in 2007 and is headquartered in Melbourne, Florida.  According to public filings with the Commission, FCHS operates five practice locations in central Florida, treating patients in orthopedic and spinal care, as well as other specialties.  In December 2010, Romandetti became President and CEO of FCHS, positions he still holds.

35.     Between December 2010 and September 2015, Burnett, Miller, Sarro, and Vassallo acquired more than 5.5 million shares of FCHS in private transactions, generally at well below market value.

36.     Burnett, Miller, Sarro, and Vassallo acquired these shares both directly from FCHS and from individuals and entities associated with FCHS.  These Defendants acquired many of the shares pursuant to loan, share exchange, or debt conversion agreements.  Once acquired, they deposited the shares into at least fourteen different brokerage accounts that they controlled, and/or re-distributed the shares amongst themselves.  For example, both Miller and Burnett acquired 145,000 shares from Mountain Peak Investments, an entity controlled by Sarro.  These shares were originally acquired by Sarro from FCHS in 2010 pursuant to a stock purchase agreement.

9

37.     Romandetti, in furtherance of the scheme alleged in this Complaint, facilitated many of the share transfers.  For example, Romandetti assisted in the creation of MedTech as a shell entity and used it as a vehicle to transfer shares to Burnett and Miller.  Burnett and Miller used MedTech to acquire one million shares of FCHS by selling their interest in MedTech to FCHS in exchange for the shares.

38.     Burnett, Miller, Sarro, and Vassallo deposited the FCHS shares acquired as part of the scheme into at least 23 different brokerage accounts in each of their names individually, and in the names of numerous entities that they controlled.

39.     When depositing the shares, these Defendants made misrepresentations regarding how they acquired FCHS shares.  For example, in February 2013, Burnett represented to Broker-Dealer A that his entity, Fuse Capital, had acquired 110,000 shares of FCHS for $55,000 from Mountain Peak Investments, an entity controlled by Sarro.  Fuse Capital never compensated Mountain Peak Investments for the claimed purchase of these shares.  Similarly, Vassallo told Broker-Dealer B in March 2014, that he had acquired 100,000 shares of FCHS for $1.25 per share from Leading Edge of Colorado, an entity controlled by Miller.  In fact, Vassallo never compensated Leading Edge of Colorado or Miller for the claimed purchase of these shares.

**B.      The Orchestrator Defendants Engaged Elite Stock Research to Pump FCHS Stock Through Aggressive Sales Tactics**

40.     Starting in September 2013, the Orchestrator Defendants engaged Elite Stock Research and Vassallo to inflate artificially the price and trading volume of FCHS stock.

41.     Vassallo and Elite Stock Research's sales personnel, including Employees 1 and 2, selected and called elderly, unsophisticated, and easily coerced victims, and aggressively encouraged them to purchase FCHS securities.  During these calls, Vassallo and Elite Stock Research's sales personnel, including Employees 1 and 2, did not inform the victims that FCHS

shareholders had compensated them to promote the stock and that sales of FCHS by these shareholders were made contemporaneously with the promotional activity, to allow the shareholders to profit from the market activity that follows the promotion – a practice known as scalping.

42.     Between September 2013 and December 2015, the Orchestrator Defendants, or entities controlled by the Orchestrator Defendants, wired nearly $1 million to Elite Stock Research as compensation for its role in promoting FCHS stock, including approximately:

- $442,000 from Burnett between January and March 2014;

- $215,000 from Sarro between September 2013 and July 2015;

- $177,000 from Miller between February and April 2014; and

- $160,000 from Romandetti between March 2014 and December 2015.

43.     While Elite Stock Research and Vassallo were aggressively promoting FCHS securities, Miller and Burnett frequently met with Vassallo to review and coordinate the number of FCHS shares purchased by victims of the scheme.

44.     Vassallo also corresponded with Miller and Romandetti, including on June 22, 2015, regarding the identity of Elite Stock Research's victims and the number of FCHS shares that victim investors had purchased for purposes of calculating Elite Stock Research's compensation.  Vassallo also e-mailed Romandetti on June 5, 2015, attaching screen shots from the online brokerage account of Victim A, to show that Elite Stock Research exercised control over Victim A's brokerage account and caused Victim A to purchase FCHS shares.

45.     Romandetti and Miller visited Elite Stock Research on several occasions to discuss and coordinate the promotion of FCHS with Vassallo and Elite Stock Research employees, including Employee 1 and 2.  For example, Romandetti provided Elite Stock

11

Research employees with exaggerated information about FCHS that could be conveyed to victims solicited by Elite Stock Research to induce them to purchase shares of the stock. The Orchestrator Defendants also frequently communicated with Vassallo by phone to discuss the sale of FCHS shares.

46.     From October 2013 through June 2016, Vassallo-controlled brokerage accounts generated approximately $485,000 in trading profits in FCHS, profits that were generated from trades following the pump of the stock. Vassallo transferred over $260,000 of these profits to his personal bank account.

### C.     Defendants Manipulated the Price of FCHS Stock

47.     Vassallo and the Orchestrator Defendants carefully coordinated the timing of Elite Stock Research's promotional campaign and designed it to coincide with manipulative trading activity by Burnett, Miller, Sarro, and Vassallo.

### 1.     Matched Trades

48.     On October 29 and 30, 2013, Burnett, Miller, and Sarro executed matched trades designed to manipulate the volume and price of FCHS stock, from FCHS's Melbourne, Florida headquarters, in coordination with each other and with Vassallo. During this two-day period, phone records show that Burnett, Miller, and Sarro were all located in Melbourne, Florida, and that Miller and Vassallo spoke on at least fourteen separate occasions. For example, on October 29, 2013 at 1:06 p.m., Miller called Vassallo. At 2:09 p.m., Vassallo sold 100 shares of FCHS for $1.40 per share and Fuse Capital, an entity controlled by Burnett through which both Miller and Burnett executed manipulative trades, purchased 100 shares of FCHS for $1.40 per share from an internet protocol ("IP") address assigned to FCHS's corporate headquarters in Melbourne, Florida. At 2:10 p.m., Vassallo sold 100 shares of FCHS for $1.38 per share, and 4J

12

Consulting, an entity controlled by Miller, purchased 100 shares of FCHS for $1.38 per share from the same IP address assigned to FCHS's corporate headquarters.

49.     Prior to the late October 2013 manipulative trading activity by these Defendants, the trading volume of FCHS stock was less than 10,000 shares per day.  On October 29, 2013, the volume increased to 31,000 shares, and, the next day, the volume exceeded 85,000 shares. Brokerage accounts controlled by Burnett, Miller, Sarro, and Vassallo accounted for over 40 percent of FCHS trading volume on these two days, including sales by Sarro of more than 26,000 shares.

50.     Throughout 2013 and 2014, these Defendants continued to place manipulative matched trades amongst themselves.  For example:

- On August 9, 2013, Miller and Burnett spoke from 3:32 p.m. to 3:42 p.m.  At 3:37 p.m., the Fuse Capital brokerage account, controlled by Burnett, sold 100 shares of FCHS for $0.64 per share, and the 4J Consulting brokerage account, controlled by Miller, purchased 100 shares of FCHS for $0.64 per share.

- On October 3, 2013, Miller called Sarro at 11:51 a.m.  At 11:53 a.m., Sarro sold 1,200 shares of FCHS for $1.28 per share, and Miller, using the Fuse Capital brokerage account, purchased 1,200 shares of FCHS for $1.28 per share.

- On October 11, 2013, Miller and Sarro spoke from 9:36 a.m. to 9:39 a.m.  At 9:39 a.m., Sarro sold 800 shares of FCHS for $1.50 per share, and Miller, using the Fuse Capital brokerage account, purchased 800 shares of FCHS for $1.50 per share.

- On April 16, 2014, Miller and Vassallo spoke by phone from 11:49 a.m. to 11:51 a.m.  At 11:53 a.m., Elite Stock Research sold 3,800 shares of FCHS for $2.64 per share, and Miller purchased 3,800 shares of FCHS for $2.64 per share.

- On April 24, 2014, Miller and Vassallo spoke by phone from 3:53 p.m. to 3:56 p.m.  At 3:59 p.m., the 4J Consulting brokerage account, controlled by Miller, sold 100 shares of FCHS for $2.54 per share, and the Elite Stock Research brokerage account, controlled by Vassallo, bought 100 shares of FCHS for $2.54 per share.

51.     In addition to executing matched trades amongst themselves, Burnett, Miller, Sarro, Vassallo, and Elite Stock Research coordinated and executed matched trades with victims of the fraudulent scheme.  While speaking to the victims, Vassallo and Elite Stock Research's sales personnel, including Employees 1 and 2, instructed victims to enter buy orders for FCHS stock in certain amounts and at certain prices, but did not disclose that they were matching the victims' FCHS trades.

52.     After a victim entered a purchase order, Vassallo would often trade on the opposite side of the victim by entering a corresponding sell order, or he would alert another Defendant so that the co-Defendant could execute a matched trade.  For example:

- On December 10, 2013, Elite Stock Research contacted Victim B at 3:20 p.m. Shortly thereafter, Vassallo, Miller, and Burnett exchanged phone calls.  At 3:43 p.m., Victim B's purchase order of 2,800 shares of FCHS stock for $1.42 per share was executed at the same time that the Fuse Capital brokerage account, controlled by Burnett, sold 2,800 shares of stock for $1.42 per share.

- On January 31, 2014, Vassallo and Miller communicated via phone at 11:38 a.m. From 11:56 a.m. to 11:58 a.m., Victim C communicated with Elite Stock Research and, at 12:01 p.m., Victim B purchased 100 shares of FCHS stock for $1.27 per share.  At the same time, the Fuse Capital brokerage account, controlled by Burnett, sold 100 shares of FCHS stock for $1.27 per share.  A few minutes later, following a telephone conversation between Miller and Vassallo, Victim C purchased an additional 4,900 shares of FCHS stock.  Burnett's entity, Fuse Capital, was again on the other side of this transaction.

- On May 22, 2015, Elite Stock Research called Victim A at 2:53 p.m., and spoke with the victim until 3:25 p.m.  At 3:03 p.m., while on the phone with Elite Stock Research, Victim A purchased 2,100 shares of FCHS stock for $1.20 per share. Vassallo sold 1,200 shares of FCHS stock for $1.20 per share on the other side of this transaction.  Victim A and Elite Stock Research spoke again from 3:39 p.m. to 3:54 p.m., and, at 3:47 p.m., Victim A purchased 2,000 shares of FCHS stock for $1.15 per share, while Vassallo sold 2,000 shares for $1.15 per share.

- Similarly, on June 2, 2015, Elite Stock Research called Victim A and spoke from 9:28 a.m. to 9:40 a.m.  At 9:40 a.m., Victim A purchased 400 shares of FCHS stock for $1.20 per share, while Elite Stock Research sold 400 shares for $1.20 per share.  Also at 9:40 a.m., Victim A purchased 1,100 shares of FCHS for $1.22 per share, and Elite Stock Research sold 1,100 shares for $1.22 per share.  One minute later, at 9:41 a.m., Victim A purchased 2,700 shares for $1.22 per share and Vassallo sold 700 shares for $1.22 per share.

53.     In total, Burnett executed more than 200 matched trades with either a victim or one of the Orchestrator Defendants, Vassallo executed more than 190 matched trades with either a victim or one of the Orchestrator Defendants, Miller executed more than 150 matched trades with either a victim or one of the Orchestrator Defendants, and Sarro executed more than 60 matched trades with either a victim or one of the Orchestrator Defendants.

### 2.     Wash Trades

54.     Vassallo further manipulated FCHS' stock price by engaging in wash trades throughout 2015.  Between June 15 and June 29, 2015, brokerage accounts controlled by Vassallo executed 16 wash trades, resulting in a total volume of 56,300 shares traded with no meaningful change in ownership.  For example:

- On June 24, 2015, Vassallo executed seven wash trades, including a wash trade at 9:45 a.m., in which he purchased 1,000 shares of FCHS for $1.10 per share through his personal account at Broker-Dealer B, at the same time that he sold 1,000 shares at the same price through an account in the name of Elite Stock Research, also at Broker-Dealer B.

- On July 2, 2015, Vassallo executed five wash trades, including a wash trade at 10:42 a.m., in which he purchased 6,200 shares of FCHS for $1.16 per share through his personal account at Broker-Dealer B, at the same time that he sold 6,200 shares at the same price through an account in the name of Elite Stock Research, also at Broker-Dealer B.

55.     Miller and Burnett conducted similarly meaningless wash trades.  Between February 2014 and April 2014, accounts controlled by Miller executed thirteen wash trades.

Similarly, between November 2013 and March 2014, accounts controlled by Burnett executed sixteen wash trades.  For example:

- On March 18, 2014, Miller executed a wash trade at 12:12 p.m., in which he purchased 5,000 shares of FCHS at $3.35 per share through an account in his name at Broker-Dealer C, at the same time that he sold 5,000 shares at the same price through an account, also in his name, at Broker-Dealer D.  The following day, on March 19, 2014, Miller again engaged in a wash trade, purchasing and selling 5,000 shares for $3.25 per share at 10:32 a.m., through accounts in his name at Broker-Dealer C and Broker-Dealer D.

- On March 21, 2014, Burnett executed a wash trade at 9:48 a.m., in which he purchased and sold 100 shares of FCHS at $3.10 per share through the same account in the name of Fuse Capital at Broker-Dealer C.  Four days later, on March 25, 2014, Burnett executed two wash trades, at 9:57 a.m. and 10:08 a.m., this time using separate accounts, both in the name of Fuse Capital, at Broker-Dealer C and Broker-Dealer D.  At 9:57 a.m., Burnett purchased and sold 10,000 shares of FCHS for $3.29 per share, and at 10:08 a.m., Burnett purchased and sold 6,300 shares of FCHS for $3.28 per share.

### 3.    Marking the Close

56.    Burnett, Miller, and Vassallo also engaged in the practice of marking the close − buying shares near the close of the market at 4:00 p.m. in an attempt to influence the closing price of FCHS.  As alleged below, Burnett, Miller, and Vassallo purchased FCHS shares near the 4:00 p.m. close, and these purchases substantially increased the closing price of FCHS:

| Date | Time | Activity | Quantity | Price |
|------|------|----------|----------|-------|
| 1/2/2014 | | Opening price of FCHS = $1.31 | | |
| | 3:53:11 p.m. | Fuse Capital purchase of FCHS | 1,000 shares | $1.30 |
| | 3:53:16 p.m. | Fuse Capital purchase of FCHS | 100 shares | $1.35 |
| | 3:55:07 p.m. | Fuse Capital purchase of FCHS | 500 shares | $1.35 |
| | 3:56:11 p.m. | Fuse Capital purchase of FCHS | 1,000 shares | $1.35 |
| | 3:56:49 p.m. | Fuse Capital purchase of FCHS | 100 shares | $1.46 |
| | 3:58:52 p.m. | Fuse Capital purchase of FCHS | 100 shares | $1.45 |
| | | Closing price of FCHS = $1.45 | | |
| 6/24/2014 | | Opening price of FCHS = $1.75 | | |
| | 3:23:35 p.m. | Miller purchase of FCHS | 2,106 | $1.75 |
| | 3:24:14 p.m. | Miller purchase of FCHS | 100 | $1.81 |
| | 3:25:28 p.m. | Miller purchase of FCHS | 200 | $1.81 |
| | 3:25:54 p.m. | Miller purchase of FCHS | 100 | $1.85 |
| | | Closing price of FCHS = $1.84 | | |
| 6/10/2015 | | Opening price of FCHS = $1.39 | | |
| | 3:55:54 p.m. | Elite Stock Research/Vassallo purchase of FCHS | 100 shares | $1.33 |
| | 3:56:12 p.m. | Elite Stock Research/Vassallo purchase of FCHS | 5,385 shares | $1.34 |
| | 3:56:15 p.m. | Elite Stock Research/Vassallo purchase of FCHS | 300 shares | $1.34 |
| | 3:56:46 p.m. | Elite Stock Research/Vassallo purchase of FCHS | 100 shares | $1.49 |
| | 3:59:54 p.m. | Elite Stock Research/Vassallo purchase of FCHS | 100 shares | $1.48 |
| | | Closing price of FCHS = $1.48 | | |

## III.     Defendants Recognized Over $3.3 Million In Illegal Profits Selling FCHS Shares

57.     Burnett's, Miller's, Sarro's, Vassallo's, and Elite Stock Research's manipulative trading artificially and significantly increased FCHS's share price.  From on or about September 19, 2013, the first date that Elite Stock Research received a payment in connection with the scheme, until on or about March 21, 2014, the price of FCHS increased from $0.90 to $3.40 per share.  Manipulative trading in FCHS continued from March 2014 through at least June 2016,

18

during which time the share price remained near or above $1.00.  In total, between September

19, 2013, and June 2016, Burnett, Miller, Sarro, Vassallo, or entities controlled by them,

executed approximately 4,300 trades in FCHS.

58.     Burnett, Miller, Sarro, Vassallo, and Elite Stock Research artificially inflated the

volume and price of FCHS securities, such that they reaped approximately $3.3 million in

trading profits.  Between September 19, 2013, and June 2016, Sarro recognized approximately

$2.3 million, Vassallo recognized approximately $485,000, Miller recognized approximately

$340,000, and Burnett recognized approximately $193,000 in trading profits.

59.     After selling FCHS shares, Burnett, Miller, Sarro, Vassallo, and Elite Stock

Research transferred the more than $3.3 million in illegal trading profits between at least 12

different bank accounts.  Sarro alone controlled at least six entities and eight brokerage accounts

that engaged in profitable and manipulative trading in FCHS.  From approximately December

2013 to March 2016, Sarro transferred a significant portion of his trading profits back to Miller

and Romandetti.  Romandetti used a portion of these illegally obtained profits to compensate

Elite Stock Research for its promotion of the stock.  Specifically, Sarro and entities he controlled

transferred approximately $140,000 to Miller and approximately $565,000 to an entity controlled

by Romandetti.

60.     For example, on or about September 26, 2014, Sarro deposited 323,125 shares of

FCHS, acquired in 2011 from the former CEO of FCHS, into his brokerage account at Broker-

Dealer E.  Between approximately September 26 and October 7, 2014, as part of the

manipulative trading scheme, Sarro sold more than 99,000 of these shares, generating profits of

more than $107,000.  On or about October 6 through October 9, 2014, Sarro wired $99,000 of

these trading profits from his brokerage account to his bank account.  Then, on or about October

20, 2014, Sarro wired $65,000 from his bank account to Miller. The following day, Miller wired the entire $65,000 to Romandetti, who then immediately wired $25,000 to Elite Stock Research.

61. Further, on or about August 17, 2015, Sarro deposited 235,000 FCHS shares into his brokerage account at Broker-Dealer E. Sarro acquired these shares the previous month for $1.00 per share from Individual A, a physician at one of FCHS's medical facilities. Romandetti facilitated the transfer from Individual A to Sarro by assisting in setting up the brokerage account on behalf of Individual A, and by paying $100,000 of the $235,000 purchase price. Between August 12 and September 30, 2015, Sarro dumped all of the 235,000 shares and received profits exceeding $300,000. Sarro then wired $160,000 of these trading profits to Romandetti, who transferred $20,000 of the proceeds to Elite Stock Research.

62. When engaging in the manipulative trading scheme of FCHS stock alleged in this Complaint, Burnett, Miller, Romandetti, Sarro, Vassallo, and Elite Stock Research knew, or were reckless in not knowing, that closely coordinated trading in a thinly traded stock in accounts controlled by Burnett, Miller, Sarro, Vassallo, and Elite Stock Research had no economic purpose, but was done solely to create a false appearance of active trading and/or to artificially increase FCHS's market price to fraudulently induce others to trade in FCHS stock so that the Defendants could benefit themselves while defrauding innocent retail investors.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder

### (Burnett, Miller, Romandetti, Sarro, Vassallo, and Elite Stock Research)

63.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 62 as if fully set forth herein.

64.     From at least September 2013 through approximately June 2016, Burnett, Miller, Romandetti, Sarro, Vassallo, and Elite Stock Research in connection with the purchase or sale of securities, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, with scienter, have employed devices, schemes, and artifices to defraud, and have engaged in transactions, acts, practices, and courses of business which operated as a fraud or deceit.

65.     By reason of the foregoing, Burnett, Miller, Romandetti, Sarro, Vassallo, and Elite Stock Research directly or indirectly, singly or in concert, have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a)(1) of the Securities Act

### (Burnett, Miller, Romandetti, Sarro, Vassallo, and Elite Stock Research)

66.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 62 as if fully set forth herein.

67.     From at least September 2013 through approximately June 2016, Burnett, Miller, Romandetti, Sarro, Vassallo, and Elite Stock Research directly or indirectly, singly or in concert, in the offer and sale of any securities, by the use of the means and instruments of transportation

and communication in interstate commerce and of the mails, knowingly or with reckless disregard for the truth employed devices, schemes or artifices to defraud.

68.     By reason of the foregoing, Burnett, Miller, Romandetti, Sarro, Vassallo, and Elite Stock Research directly or indirectly, singly or in concert, have violated, and unless enjoined will continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## THIRD CLAIM FOR RELIEF

### Violations of Section 17(a)(3) of the Securities Act

### (Burnett, Miller, Romandetti, Sarro, Vassallo, and Elite Stock Research)

69.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 62 as if fully set forth herein.

70.     From at least September 2013 through approximately June 2016, Burnett, Miller, Romandetti, Sarro, Vassallo, and Elite Stock Research directly or indirectly, singly or in concert, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

71.     By reason of the foregoing, Burnett, Miller, Romandetti, Sarro, Vassallo, and Elite Stock Research directly or indirectly, singly or in concert, have violated and unless enjoined will continue to violate Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## FOURTH CLAIM FOR RELIEF

### Violations of Section 9(a)(1) of the Exchange Act

**(Burnett, Miller, Sarro, Vassallo, and Elite Stock Research)**

72.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 62 as if fully set forth herein.

73.     Since at least September 2013 through approximately June 2016, Burnett, Miller, Sarro, Vassallo, and Elite Stock Research, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce or by the use of the mails, knowingly or recklessly, and for the purpose of creating a false or misleading appearance of active trading in the securities of FCHS or a false or misleading appearance with respect to the market for such securities, (a) have effected transactions in such securities which involved no change in the beneficial ownership thereof; (b) have entered an order or orders for the purchase of such securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such securities, had been or would be entered by or for themselves or different parties; and/or (c) have entered, are entering, or are about to enter an order or orders for the sale of such securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such securities had been or would be entered by or for themselves or different parties.

74.     By reason of the foregoing, Burnett, Miller, Sarro, Vassallo, and Elite Stock Research have violated, and unless enjoined will continue to violate, Section 9(a)(1) of the Exchange Act [15 U.S.C. §78i(a)(1)].

## FIFTH CLAIM FOR RELIEF

### Violations of Section 9(a)(2) of the Exchange Act

**(Burnett, Miller, Vassallo, and Elite Stock Research)**

75.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 62 as if fully set forth herein.

76.     From at least September 2013 through approximately June 2016, Burnett, Miller, Vassallo, and Elite Stock Research directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, with specific intent, effected, alone or with other persons, a series of transactions in the securities of FCHS, not a government security or in connection with any security-based swap agreement with respect to such security, creating actual or apparent active trading in such security, for the purpose of inducing the purchase or sale of such security by others.

77.     By reason of the foregoing Burnett, Miller, Vassallo, and Elite Stock Research have violated, and unless enjoined will continue to violate, Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

## SIXTH CLAIM FOR RELIEF

### Violations of Section 15(a) of the Exchange Act

**(Vassallo and Elite Stock Research)**

78.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 62 as if fully set forth herein.

79.     From certain times starting as early as September 2013 through approximately June 2016, Vassallo and Elite Stock Research, while acting as brokers engaged in the business of effecting transactions in securities for the account of others made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to

induce the purchase or sale of the securities of FCHS without being registered in accordance with Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

80.     By reason of the foregoing, Vassallo and Elite Stock Research have violated, and unless enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court issue a Final Judgment:

### **I.**

Finding that Defendants each violated the Federal securities laws and rules promulgated thereunder as alleged against them in this Complaint.

### **II.**

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, directly or indirectly, from committing future violations of each of the Federal securities laws and rules promulgated thereunder that are alleged in this Complaint, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and/or Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

### **III.**

Ordering all Defendants to disgorge any and all ill-gotten gains they received as a result of the violations of the Federal securities laws and the rules promulgated thereunder that are alleged in this Complaint, plus prejudgment interest thereon, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

**IV.**

Ordering all Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

**V.**

Ordering all Defendants to be barred from participation in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and/or Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

**VI.**

Ordering Romandetti and Burnett, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and/or Section 21(d)(2) of the Exchange Act [15 U.S.C.§ 78u(d)(2)], to be barred from serving as an officer or director of any issuer that has a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**VII.**

Granting such other and further relief as the Court may deem just and proper.

Dated:       November 15, 2018          Respectfully submitted,

*Cecilia B. Connor*

Cecilia B. Connor (CB5956)
SECURITIES AND EXCHANGE
COMMISSION
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
215-597-2950
connorce@sec.gov

James E. Smith (motion for admission *Pro
Hac Vice* pending)
SECURITIES AND EXCHANGE
COMMISSION
100 F Street, NE
Washington, DC 20549-5985
202-551-5881
smithja@sec.gov

OF COUNSEL:

Amy Friedman
Andrew Elliott
SECURITIES AND EXCHANGE
COMMISSION
100 F Street, NE
Washington, DC 20549-5985